# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FUENTES-FERNANDEZ<br>& COMPANY, PSC,<br><br>Plaintiff,<br><br>v.<br><br>THE CORVUS GROUP, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 15-0751 (ABJ)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Plaintiff Fuentes-Fernandez & Company, PSC ("FFC") entered into a Teaming Agreement with defendant The Corvus Group, Inc. ("Corvus") in 2014 so that the two companies could jointly submit a response to a particular Request for Proposal ("RFP") issued by the Small Business Administration. The Teaming Agreement contemplated that if the bid succeeded, Corvus would be the prime contractor and FFC would have the opportunity to serve as a subcontractor or consultant, but the contract was ultimately awarded to another offeror.

In this case, plaintiff FFC claims that Corvus breached the Teaming Agreement and improperly used FFC's proprietary information when it later submitted its own proposal in response to another RFP issued by the same agency. Compl. [Dkt. # 1] at 1. FFC, which was the incumbent on both projects, and which submitted its own solo proposal in response to the second RFP, is obviously disappointed that its joint bid with Corvus was unsuccessful, and that Corvus has now secured a contract that was previously FFC's. It sued Corvus for breach of the Teaming Agreement, misappropriation of its trade secrets, and for other torts related to Corvus's success on the subsequent bid. *See* Compl.

Defendant moved to dismiss the entire complaint for failure to state a claim.  Def.'s Mot. to Dismiss [Dkt. # 11] ("Def.'s Mot.").  After the motion to dismiss was fully briefed, FFC filed a motion for leave to amend its complaint to add a claim of breach of fiduciary duty and to clarify a number of the allegations in the original complaint.  Pl.'s Mot. for Leave to File Amended Compl. [Dkt. # 17].  ("Pl.'s Mot. to Amend").  The Proposed Amended Complaint focuses on the use of confidential information and eliminates the specific performance and breach of contract claims predicated on any continuing validity of the Teaming Agreement.  The revised lawsuit is premised on FFC's contention that Corvus would not have been able to submit a competitive proposal on the subsequent RFP had it not made improper use of the confidential information it received when it teamed with FFC.  Compl. ¶¶ 65, 70; Proposed Am. Compl. [Dkt. # 17-1] ¶¶ 65, 70.  In the original complaint, plaintiff alleged that Corvus was contractually bound by the Teaming Agreement to team with FFC on the second procurement, and it sought specific performance and compensatory damages for the lost opportunity.  Compl. ¶¶ 84–85.

But the proposed amendments do not eliminate the deficiencies in the complaint, so the motion for leave to amend will be denied on futility grounds, and the motion to dismiss will be granted. Plaintiff's conclusory allegations that its trade secrets have been misappropriated do not survive the test to be applied when a court considers a motion under Rule 12(b)(6), and neither the claims set forth in the proposed amended complaint nor those in the original complaint state a claim upon which relief can be granted.  The Court emphasizes that this ruling is founded upon a close reading of the Teaming Agreement, the two complaints, and the applicable legal authorities, and it is not premised upon defendant's allegations of bad faith.[1]

---

1       The level of vituperation that permeated the pleadings on both sides did more to obscure than enhance the arguments advanced by counsel in this case.

## BACKGROUND

FFC is a government contractor that provided services to the SBA relating to three risk oversight programs.  Compl. ¶¶ 6–7.  FFC is "in the business of providing financial services to its clients" such as "auditing, consulting, taxes, and other services."  *Id.* ¶ 12.  In March of 2014, SBA held a "Pre-Solicitation Conference" in advance of soliciting bids for the "7a Guaranteed Loan Program."  *Id.* ¶¶ 6, 14; *see also* Ex. 2 to Compl. [Dkt. # 1-2][2] at 8 (SBA PowerPoint from the March 2014 meeting describing the program).   The purpose of the conference was to "allow prospective bidders the opportunity to gain a better understanding of the objective of the solicitation," and to "offer[] SBA an opportunity to stress the importance of the significant elements of the Request for Proposal."  Compl. ¶ 21; Ex. 2 to Compl. at 6.  FFC was the incumbent contractor for the program, and both FFC and Corvus attended the March 2014 meeting.  Compl. ¶ 6.

Two months later, FFC agreed to meet with Corvus to discuss a potential teaming agreement to bid on the RFP discussed at the March 2014 meeting together.  Compl. ¶¶ 8, 25, 27.[3] On May 9, 2014, they entered into the contract at the heart of this case, entitled "Teaming Agreement."  Compl. ¶¶ 31, 33; Ex. 5 to Compl. [Dkt. 1-7] (the "Agreement" or "TA").  The

---

2      Although the Court's review of a motion to dismiss is generally limited to the allegations in the complaint, in ruling upon a motion to dismiss for failure to state a claim, a court may consider "documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice."  *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).   Thus, the Court will consider the PowerPoint and the other exhibits that plaintiff attached to its complaint, including the Teaming Agreement.

3      The complaint alleges that the March 2014 meeting was held to discuss more than one RFP.  *See* Compl. ¶¶ 18, 23.  But it also acknowledges that the PowerPoint shown at the meeting described the 7a Program only.  *Id.* ¶ 19; *see also* Ex. 2 to Compl.

Agreement stated that the SBA had "issued a Request for Proposal, RFP Number SBAHQ-14-R-0003 . . . for SBA 7A Risk Oversight Support Services ("the Program"),"[4] and that the parties sought to enter into an arrangement for the preparation and submission of a proposal. TA Recitals ¶¶ A–B. The Teaming Agreement contemplated that if Corvus was selected by the SBA as the prime contractor on RFP-3, and if the "performance thereof require[d] the services of [a subsidiary] as set forth in the proposal," Corvus would "offer to [FFC] a subcontract for such services and the parties [would] in good faith negotiate a mutually acceptable subcontract for such services." TA ¶ 2. The contract contains a termination provision in which the parties agreed that the Teaming Agreement would terminate upon notice that RFP-3 had been awarded to another contractor. TA ¶ 3(B). The Agreement was also explicit about its scope: "[t]his Agreement shall relate only to the Program specified herein, and nothing herein shall be deemed to . . . confer any right or impose any obligation or restriction on either party with respect to any other program . . . ." TA ¶ 7(A).

The Teaming Agreement contained several other provisions relevant to this litigation. First, the Agreement contained a non-solicitation provision: both parties agreed that, for a period of one year following the termination of the Agreement, neither would "actively solicit, employ or otherwise engage any of the other party's employees (including former employees) who were involved in the proposal." TA ¶ 11. The Agreement also included two provisions related to proprietary information: the parties agreed in paragraph 4 to keep any proprietary information exchanged in the performance of the agreement confidential and to use it only in connection with their obligations under the agreement, and in paragraph 12, they defined "confidential

---

4       For clarity, defendant refers to this RFP as "RFP-3," and the Court will adopt that nomenclature. *See* Def.'s Mot. at 1 & n.1.

information," and each agreed not to disclose or use confidential information received from the other for its own use for a period of two years.  *Id.* ¶¶ 4; 12(B), (E), (K).[5]

On September 22, 2014, the parties received a Notice of Award announcing that the contract had been awarded to another bidder.  *See* Ex. 10 to Compl. [Dkt. # 1-10]**;** Compl. ¶ 56 (alleging that the contract for the 7a Program was awarded to Garcia & Ortiz, P.A.).  But while that solicitation was still pending, on July 8, 2014, the SBA issued another RFP – for its "Safety and Soundness Loan Risk Oversight" program:  solicitation number "SBAHQ-14-R-0016."[6]  Ex. 8 to Compl. [Dkt. # 1-8]; Compl. ¶ 47.  Corvus submitted an offer in response to RFP-16 on or

---

5       There is considerable ambiguity in the contract concerning the duration of this obligation. Paragraph 3, the termination provision, clearly states that "except as expressly provided in Paragraphs 1, 2, 4, and 5," all rights and obligations of the parties under the agreement "shall terminate on the earliest of" a series of events, including notice that the prime contract will not be awarded to Corvus.  TA ¶ 3.  So it appears that the parties may have intended to exempt the Proprietary Information provision in paragraph 4 from the termination clause, but there is no other time for termination "expressly provided" in that paragraph.  Paragraph 4 does relieve the receiving party of liability for use or disclosure once three years have passed from the date of the disclosure. *Id.* ¶ 4(E).  Paragraph 12 is not expressly exempted from the termination provision, but it states that the "[r]eceiving party's obligations under this Paragraph 12 shall commence at the date of this Agreement and shall expire two (2) years after the date of disclosure."  *Id.* ¶ 12(K).  It is not clear from the Agreement why the parties elected to include two similar but not identical provisions governing the use of proprietary information in the contract, but the difference between two and three years is not germane to the issues to be decided in connection with the motions pending before the Court.

6       Defendant refers to the bid that Corvus won as "RFP-16", and the Court will adopt that nomenclature as well.  Def.'s Mot. at 1 & n.1; *see* Compl. ¶ 74.

before November 14, 2014, *see* Proposed Am. Compl. ¶ 75,[7] and on March 11, 2015, Corvus was awarded the contract on RFP-16.  Compl. ¶¶ 67–69; Ex. 12 to Compl. [Dkt. # 1-12].[8]

Plaintiff FFC filed this lawsuit on May 20, 2015.  The five-count original complaint alleged that Corvus misappropriated the trade secrets FFC divulged for the purpose of preparing a joint proposal in response to RFP-3 and used them in violation of the contract to respond to RFP-16 and win other SBA business.  *See, e.g.*, Compl. ¶¶ 65 (alleging that "Corvus could not have submitted a competitive proposal for the SBA's Safety and Soundness Program without utilizing the confidential and proprietary information, including pricing, provided to it by" FFC).  It also asserted that Corvus was still bound by the Teaming Agreement, and that it was required to utilize FFC as a subcontractor on the contract it won on its own.  Compl. ¶ 85.  Count I demanded specific performance:  FFC asked the Court to order Corvus to "negotiate a mutually acceptable subcontract" for RFP-16 because Corvus was still bound by the Agreement to team with FFC. Compl. ¶¶ 76–85; *see* TA ¶ 2.  Count II also alleged that Corvus breached the Teaming Agreement in obtaining the contract for the second program on its own, and FFC asked for damages to compensate for the lost subcontract to which it claimed to be entitled.  Compl. ¶¶ 86–89.  Count III alleged fraud in the inducement of the contract; it asserted that Corvus represented that it would keep FFC's proprietary information confidential and that it would negotiate a subcontract with FFC in good faith if it was the successful bidder, and that Corvus did not intend to, and ultimately did not, abide by those promises.  *Id.* ¶¶ 90–103.  Count IV alleged unfair competition and

---

7      The record indicates that FFC submitted its own bid as well, without asking for Corvus's assistance.  Pl.'s Opp. to Def.'s Mot. [Dkt. # 15] ("Pl.'s Opp.") at 8.

8      After Corvus was awarded the contract, the incumbent, FFC, requested a debriefing from the SBA.  A letter from the SBA summarizing its assessment of the strengths and weaknesses of plaintiff's proposal was provided to the Court as part of the briefing on the Motion to Dismiss.  Ex. 1 to Pl.'s Opp. [Dkt. # 15-1].

misappropriation of trade secrets. *Id.* ¶¶ 104–106. Finally, Count V sought injunctive relief:[9] it alleged that Corvus intends to solicit and hire an FCC Project Manager, Frederick Babb, to work on RFP-16, and it asked the Court to prohibit Corvus from doing so on the grounds that it would violate the non-solicitation clause of the Teaming Agreement. *Id.* ¶¶ 107–112.

On July 31, 2015, defendant Corvus moved to dismiss on the grounds that the complaint failed to state a claim upon which relief could be granted, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Def.'s Mot. Corvus argued that the Teaming Agreement terminated when the SBA selected another offeror in connection with RFP-3, and that it had no contractual obligations to plaintiff in connection with RFP-16. *Id.* at 8–10. It also maintained that the claims based upon a breach of the confidentiality provisions of the agreement were entirely conclusory,

---

9       In the complaint, plaintiff recited the elements necessary for the grant of a preliminary injunction, and plaintiff requested both preliminary and permanent injunctive relief, but plaintiff has never filed a motion for preliminary injunction pursuant to Fed. R. Civ. P. 65 that comports with Local Civil Rule 65.1(c).

and it proffered evidence of its own to show that plaintiff's claims were implausible.[10]  In response,

FFC voluntarily withdrew the specific performance count (Count I).  Pl.'s Notice of Partial

Voluntary Dismissal [Dkt. # 14], but it otherwise opposed the motion. Pl.'s Opp.  Defendant

replied in support of its motion on September 14, 2015.  Def.'s Reply in Supp. of Def.'s Mot. [Dkt.

# 16] ("Def.'s Reply").

---

10     Corvus asked the Court to take judicial notice of a government document, the SBA letter of March 16, 2014 containing the agency's assessment of the weaknesses in FFC's proposal for RFP-16 – in particular, its pricing – and draw the conclusion that it was unlikely that Corvus, the winning bidder, had used the unsuccessful bidders' pricing strategy in submitting its proposal. Defendant took the position that utilizing the exhibit in this manner would not convert the motion to a motion for summary judgment.  *See* Def.'s Mot. at 5 n.3.  Defendant cites no binding Circuit authority for this proposition, and the district court cases it does cite are inapposite.  While it is correct that merely taking judicial notice of a fact does not automatically transform a motion to dismiss into a motion for summary judgment, the court is still bound to consider *all* facts in the light most favorable to the plaintiff when deciding whether, assuming the truth of all of the plaintiff's allegations, those allegations suffice to state a claim.  Here, defendant asks the court to draw an inference in *its* favor from the letter – to conclude, contrary to plaintiff's factual allegations, that it is more likely than not that any FFC proprietary information was *not* used.  This turns Rule 12(b)(6) on its head.

     In *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56 (D.D.C. 2014), the court laid out the general principle that it was authorized to take judicial notice of facts contained in, *inter alia*, "public records and government documents available from reliable sources."  *Id.* at 67–68, citing Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").  The Court is not certain that the non-public letter expressing the Technical Evaluation Panel's opinions would qualify, but even if it does, the court in *Al-Aulaqi* did not specifically address the question of whether the recognition of public facts transformed the motion into a motion for summary judgment.  The case does not stand for the proposition that a court can draw inferences in defendant's favor from government records and use those inferences to grant a motion to dismiss on the merits; indeed, in *Al-Aulaqi*, the court noted that the defendants had "concede[d] . . . that '[a]ny additional specific facts included in the AG Letter . . . that either are not alleged in the complaint or might be contrary to Plaintiffs' well-pled allegations would not technically be before the Court . . . .'"  *Id.* at 68.

     Similarly, in *Peart v. Latham & Watkins LLP*, 985 F. Supp. 2d. 72 (D.D.C. 2013), the court took judicial notice of records of the proceedings before the D.C. Office of Human Rights and the EEOC in connection with jurisdictional and statute of limitations issues, *see id.* at 86–88, and the court did not consider materials from government files in assessing whether plaintiff's factual allegations were plausible or not.

Then, on September 23, 2015, plaintiff filed a motion for leave to file an amended complaint, which was submitted as an exhibit to the motion.  Pl.'s Mot. for Leave; Proposed Am. Compl.  FFC proposes to make several changes to the complaint:  the specific performance count is omitted, and a claim of breach of fiduciary duty has been added.  Proposed Am. Compl. ¶¶ 110– 114.  According to plaintiff, the proposed amended complaint "supplement[s] and clarifie[s]" its allegations regarding Babb's relationship with FFC, *see* Proposed Am. Compl. ¶¶ 8, 116, 119, and its status as the incumbent contractor for RFP-3 and RFP-16.  Proposed Am. Compl. ¶ 44.  Plaintiff also maintains that the amendment adds "consistency on definitions and RFPs to which the facts refer," clarifies the allegations regarding defendant's alleged use of its trade secrets, and provides "more information" on the damages resulting from Corvus' conduct.  *See* Pl.'s Mot. for Leave at 3.  Notably, plaintiff no longer alleges that it was a breach of contract for Corvus to submit an offer in response to RFP-16 by itself; the proposed amended complaint is predicated solely on the theory that Corvus could not possibly have put together a successful proposal on its own without relying upon FFC's proprietary information, including pricing, that had been disclosed under the Teaming Agreement.

Defendant opposed plaintiff's motion for leave to amend its complaint on October 9, 2015, arguing both that amendment would be futile, and also that FFC's motion was brought in bad faith, Def.'s Opp. to Pl.'s Mot. for Leave [Dkt. # 21] ("Def.'s PAC Opp."), and plaintiff replied.  Pl. FFC's Reply to Def.'s PAC Opp. [Dkt. # 23] ("Pl.'s PAC Reply").

During the Court's review of the matter, it noticed that that paragraph 20 of the Teaming Agreement provided that "[t]he parties hereby submit to the exclusive personal and subject matter jurisdiction and venue" of the "State or Federal Courts located in Chicago, Illinois."  *See* TA ¶ 20. The Court ordered the parties to brief the issue of whether venue was proper in this district in light

of that provision.  *See* Min. Order (Dec. 21, 2015).  The parties jointly replied that the forum

selection clause did not limit this Court's jurisdiction, and, in any event, both parties waived any

objection to venue in this jurisdiction.  Joint Mem. on Venue [Dkt. # 24] at 2, citing *Atl. Marine

Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 577 (2013).

## STANDARD OF REVIEW

### I.    Motion for Leave to Amend

When a party seeks to amend its pleading after a responsive pleading has been served, the

Court should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see

Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).  When evaluating whether to grant

leave to amend, however, the Court must consider these factors:  (1) undue delay; (2) prejudice to

the opposing party; (3) futility of the amendment; (4) bad faith; and (5) whether the plaintiff has

previously amended the complaint.  *Atchinson v. District of Columbia*, 73 F.3d 418, 425–26 (D.C.

Cir. 1996), quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The Court may deny leave to

amend based on futility if the proposed claims would not survive a motion to dismiss.  *Rumber v.

District of Columbia*, 598 F. Supp. 2d 97, 102 (D.D.C. 2009), citing *James Madison Ltd. v. Ludwig*,

82 F.3d 1085, 1099 (D.C. Cir. 1996).

### II.    Motion to Dismiss

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim

is facially plausible when the pleaded factual content "allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* at 678, citing *Twombly*, 550

U.S. at 556.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for

more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550

U.S. at 556.  A pleading must offer more than "labels and conclusions" or a "formulaic recitation

of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed

liberally in the plaintiff's favor, and the Court should grant the plaintiff "the benefit of all

inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d

1271, 1276 (D.C. Cir. 1994).  Nevertheless, the Court need not accept inferences drawn by the

plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court

accept plaintiff's legal conclusions.  *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C.

Cir. 2002).

## ANALYSIS

**I.      The Court will apply the law of Illinois to this dispute.**

The Court begins with the threshold question of whether it must apply the law of the State

of Illinois, or the law of the District of Columbia.  The Agreement provides that it "shall be

governed by and construed in accordance with the laws of Chicago, IL, without regard to the

conflict of laws provisions thereof."  TA ¶ 20.  Defendant asserts, based on that provision, that

Illinois law should control this dispute.  Def.'s Mot. at 7.  Choice of law provisions in contracts

are enforceable, and, when they exist, courts must apply the state law specified in the contract.  *S.*

*Cal. Edison Co. v. FERC*, 502 F.3d 176, 181 (D.C. Cir. 2007) ("[Defendant] may not ignore the

plain language of a contract but instead must 'give effect to the unambiguously expressed intent

of the parties.'"), quoting *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003); *see*

*also Milanovich v. Costa Crociere, S.P.A.*, 954 F.2d 763, 767 (D.C. Cir. 1992) ("Under American law, contractual choice-of-law provisions are usually honored."), citing Restatement (Second) of Conflict of Laws § 187 (1971).

Plaintiff responds that the Court should apply the law of the District of Columbia, because it is "unaware" of any relevant laws of *Chicago*, Illinois – the locale identified in the provision -- as opposed to Illinois state law in general.  Pl.'s Opp. at 13.  Plaintiff also contends that its tort claims are not subject to the Teaming Agreement, and should therefore be analyzed under District of Columbia law.  *Id.* at 12.[11]  Defendant points out that the choice of law problem is irrelevant in any event because the law of the state of Illinois and of the District of Columbia are materially similar for purposes of plaintiff's causes of action.  Def.'s Reply at 6 n.2.

The Court will apply the law of the State of Illinois to this dispute.  The Teaming Agreement unambiguously invoked the law of Illinois – even if in this, as in many other respects, it was poorly drafted – and the Court must therefore apply it.  *See S. Cal. Edison Co.*, 502 F.3d at 181.

## II.   Plaintiff has failed to state a claim for breach of contract.

Count I of the original complaint was voluntarily withdrawn, and it does not reappear in the proposed amended complaint.  It alleged that Corvus breached the Teaming Agreement by using plaintiff's confidential and proprietary information, including pricing, in submitting its own proposal in response to RFP-16, and, based on the theory that the Agreement was still in force, it called for specific performance of the provision in the contract that called for the negotiation of a mutually agreeable subcontract.  Compl. ¶¶ 77–85.

---

11     As the Court will discuss, plaintiff's tort claims are barred by the economic loss doctrine, a doctrine that applies both under Illinois and D.C. law.

In Count II of the original complaint, FFC re-alleged all of the preceding paragraphs, including the allegations that Corvus breached the Teaming Agreement when it utilized confidential information and bid on RFP-16, and it sought damages predicated on the loss of the subcontract. *See* Compl. ¶¶ 63-74, 86-88.  After defendant moved to dismiss on the grounds that the contract had expired, the claim was reformulated in Count I of the Proposed Amended Complaint as a cause of action for damages for breach of contract and breach of the duty of good faith and fair dealing based solely on the alleged use of FFC's trade secrets.  Proposed Am. Compl. ¶¶ 77-78, 83.  FFC has abandoned its claim that it was a violation of the Agreement for Corvus to bid on the second proposal at all, but it alleges that the confidentiality provisions survived the expiration of the contract. *Id.* ¶ 82.  Since the Proposed Amended Complaint fails to plausibly allege that Corvus used confidential information in violation of the Teaming Agreement, and, as plaintiff has apparently conceded, any obligation to enter into a subcontract terminated when the contract involved in RFP-3 was awarded to another bidder, the Court will deny FFC's motion to amend the breach of contract claim as futile and grant defendant's motion to dismiss Count II of the original complaint.

### A.   Corvus had no contractual obligation to enter into a subcontract with FFC if its bid on RFP-16 was successful.

To state a claim for breach of contract under Illinois law, plaintiff must show:  "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 600 (7th Cir. 2014), quoting *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th

Cir. 2010).[12]   In construing a contract, courts "do not look at any one contract provision in isolation;" instead, courts read the document as a whole.  *Reger Dev.*, 592 F.3d at 764, citing *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 689 (Ill. 1958).

Here, the Teaming Agreement expressly limited the parties' relationship to the contract underlying RFP-3, and it specified that it would terminate upon notice that the contract had been awarded to another offeror.  The Agreement begins with these recitals:

> The Small Business Association ("Client") has issued a Request for Proposal, RFP Number SBAHQ-14-R-0003 (the "RFP") for SBA 7A Risk Oversight Support Services (the "Program").
>
> Corvus and [FFC] desire to enter into an arrangement for the preparation and submission of a proposal in response to the RFP.
>
> Corvus and [FFC] further desire that Corvus be the prime contractor . . . and [FFC] either be:  1.) a subcontractor for purposes of responding to the RFP and performing any work awarded to either party in connection with the RFP; or 2.) a consultant performing work on the project.

TA Recitals ¶¶ A–C.

Paragraph 3 provides that the Teaming Agreement "shall terminate" upon notice from the SBA "that the prime contract will not be awarded to [Corvus]" or if the contract were awarded to another bidder, whichever occurred earlier.  TA ¶ 3.  Finally, Paragraph 7, entitled "Scope of Agreement," reiterates that the "Agreement shall relate only to the Program specified herein, and nothing herein shall be deemed to . . . confer any right or impose any obligation or restriction on either party with respect to any other program effort."  TA ¶ 7.  The term "the Program," as noted above, had already been defined in the recitals to refer to the particular SBA 7A Risk Oversight Support Services contract involved in RFP-3.  TA Recitals ¶ A.  *See also* Compl. ¶ 13 ("From

---

12      If the Court considered the contract under D.C. law, the outcome would be the same.  Under D.C. law, plaintiff would have to plausibly allege:  the existence of a valid contract, a duty arising out of the contract, breach, and damages.  *See Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014), quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).

2009 until the present, FFC has been under contract with the SBA for the SBA's Safety and Soundness ROSS, and, since 2013, for the SBA's 7a and 504 *Programs* . . . .") (emphasis added); *id.* ¶ 14 ("On March 5, 2014, the SBA's Office of the Chief Financial Officer, Acquisition Division, held a Pre-Solicitation Conference for the 3 SBA Programs, *featuring the 7a Program as the first of the 3 SBA Programs procurements* . . . .") (emphasis added); and *id.* ¶ 47 ("The SBA's Request for Proposals for the continuation of the SBA's Safety and Soundness ROSS, *another of the 3 SBA Programs,* was issued in late July 2014.") (emphasis added).

So the Teaming Agreement terminated on September 22, 2014 when the SBA 7a contract for which RFP-3 was issued was awarded to another bidder, *see* Compl. ¶ 56 ("On September 22, 2014, the SBA issued its notice of the award of a contract for [RFP-3] . . . to Garcia & Ortiz, P.A. . . . ."), as plaintiffs appear to concede. *See* Pl.'s Opp. at 13 (acknowledging that "the Agreement expired on September 22, 2014, when a contract pursuant to RFP-3 was awarded to another proposer."). Responses to RFP-16 were not due until November 14, 2014. *See* Ex. 11 to Compl. [Dkt. # 1-11] at 1. Therefore, there was no valid contract obligating Corvus to team with FFC on RFP-16 that could have been breached by Corvus's submission of a solo proposal or its failure to negotiate a subcontract after it received the award. Since FFC cannot plausibly allege the existence of a valid and enforceable contract to team on RFP-16, the original Count II fails to state a claim for damages for breach of contract.

**B.     The proposed amendment of the breach of contract claim would be futile because Count I of the Proposed Amended Complaint fails to state a claim for breach of the confidentiality provisions.**

Count I of the Proposed Amended Complaint alleges that defendant breached the confidentiality provisions of the Teaming Agreement and the duty of good faith and fair dealing when it used FFC's trade secrets to submit a proposal on RFP-16. Proposed Am. Compl. ¶ 77. It claims that "[a]lthough the Teaming Agreement has expired, the duties imposed on Corvus by

15

Articles 4 and 12.K thereof have not." *Id.* ¶ 82. While FFC's position on the duration of the confidentiality obligations may be supported by the contract, its allegations that those provisions have been violated are entirely conclusory. Even though the motion for leave to file the amended complaint was submitted after the motion to dismiss the original complaint had been fully briefed, plaintiff's second bite at the apple still lacks the necessary factual underpinnings to enable a court to draw an inference that the defendant is liable, and so the amendment would be futile under the *Iqbal* standard.[13]

The proposed amended complaint contains the following allegations in support of the breach of contract claim:

- "It was obvious in May 2014 that in order for Corvus to successfully navigate the procurement process for the SBA's 7a Program, it would be of great value for Corvus to have access to the Incumbent Contractor's (FFC's) Trade Secrets, including its Technical Trade Secrets and its Pricing Trade Secrets in order to prepare Corvus' proposal for the 7a Program." Proposed Am. Compl. ¶ 40;

- "After FFC executed the Teaming Agreement, FFC sent Corvus its Trade Secrets which included its substantial confidential and proprietary Technical Trade Secrets and Pricing Trade Secrets developed during its performance as Incumbent Contractor for the 3 SBA Programs, including [RFP-16]." *Id.* ¶ 41;[14]

- "Defendant Corvus could not have submitted a competitive proposal for RFP-16 without utilizing FFC's Trade Secrets since, upon information and belief, Corvus had no experience bidding on or performing contracts to manage the 3 SBA Programs." *Id.* ¶ 65;

- "There is no way that defendant Corvus could have submitted a successful proposal for the S&S ROSS pursuant to RFP-16 without FFC's Trade Secrets." *Id.* ¶ 70;

- "By utilizing FFC's Trade Secrets for the purpose of submitting a proposal for its own account pursuant to RFP-16, defendant Corvus breached its duty of good faith and fair dealing in connection with the Teaming Agreement." *Id.* ¶ 77;

13 Therefore the Court need not take up defendant's argument that the motion for leave to amend was animated by bad faith. *See* Def.'s PAC Opp. at 10 ("FFC should not be permitted to replace its initial story with a wholly inconsistent version at this juncture . . . .").

14 FFC does not explain why, given the express limitations on the scope of the Teaming Agreement, it elected to share confidential information concerning all three SBA programs.

- "By utilizing FFC's Trade Secrets for the purpose of submitting a proposal for its own account pursuant to RFP-16, Corvus acted in bad faith." *Id.* ¶ 78; and

- "For defendant Corvus to have submitted an independent proposal pursuant to RFP-16 using FFC's Trade Secrets was a breach of the Teaming Agreement." *Id.* ¶ 83.

FFC does not specifically describe the information that it provided to Corvus in connection with RFP-3, nor does it allege that any of the information it provided was labeled or designated in writing as proprietary or confidential. But since both paragraph 4 and paragraph 12 of the Teaming Agreement specifically cover information "which, given its character and nature, a reasonable person under like circumstances would treat as proprietary," TA ¶¶ 4, 12(B)(iii), that omission is not fatal to plaintiff's claim. *See* Proposed Am. Compl. ¶ 72. However, even if plaintiff's vague and summary references to its disclosure of "confidential and proprietary technical and pricing data," Proposed Am. Compl. at 1, or "confidential and proprietary Technical Trade Secrets and Pricing Trade Secrets," *see id.* ¶¶ 41, 43, are sufficient to give rise to an inference that some information was disclosed that was covered by the confidentiality provisions in the Agreement, plaintiff offers nothing beyond mere speculation that the information was "used" in violation of those provisions.

The Proposed Amended complaint does not allege what information was used, or how it was used, and most important, it does not offer any facts from which one could draw the inference that it was used. Paragraph 65 simply posits that "[d]efendant Corvus could not have submitted a competitive proposal for RFP-16 without utilizing FFC's Trade Secrets since, upon information and belief, Corvus had no experience bidding on or performing contracts to manage the 3 SBA Programs." Proposed Am. Compl. ¶ 65. And paragraph 70 is more emphatic but even more conclusory: "[t]here is no way that defendant Corvus could have submitted a successful proposal

for the S&S ROSS pursuant to RFP-16 without FFC's Trade Secrets."[15]  "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and since a court need not accept a plaintiff's legal conclusions, or draw any inferences that are advanced without factual support, the court is left with nothing here upon which liability could be founded.[16]

In the end, plaintiff's proposed first cause of action boils down to its complaint that it was the incumbent on the SBA programs, it agreed to partner with another company for a follow-on procurement for one of them, it shared what it knew about the contracts with that company, and now that former teaming partner has turned around and secured the next contract on its own.  But this undeniably frustrating set of circumstances is not sufficient to state a claim for breach of the Teaming Agreement since the contract specifically contemplated that the parties could each bid for the subsequent programs alone.  Notwithstanding the confidentiality provision, the Teaming Agreement was explicit about its limited scope, TA ¶ 7, and the agreement not to compete expired with the contract.  TA ¶ 1.G.  So the risk that Corvus might unseat the incumbent was baked into the contract, and FFC cannot predicate this action on a breach of paragraph 4 or 12 without specific

---

15      The Court may be bound by plaintiff's statements of fact, but it is not bound by plaintiff's conclusion, which does not even flow logically from its own factual allegations.  If the bid the two parties submitted together on RFP-3, with the benefit of FFC's proprietary information, was unsuccessful, and on RFP-16, FFC's own bid was rejected and Corvus's carried the day, it does not necessarily follow that Corvus must have relied on FFC's technical and pricing data when it submitted the second offer alone.

16      Furthermore, to state a claim for breach of contract, a plaintiff must allege facts sufficient to establish the element of damages resulting from the breach, and plaintiff has failed in that regard as well.  Plaintiff claims its damages to be its expected profit on RFP-16, but there are no facts alleged upon which a court could conclude that absent Corvus' bid, FFC would have been the successful offeror.

factual allegations that would tend to show that information that was covered by those provisions was actually used in some specific way.

III.   **FFC's claims of unfair competition and breach of fiduciary duty are barred by the economic loss doctrine.**

Count IV of the original complaint alleged that by submitting a proposal for RFP-16 and receiving the award of a contract on that RFP, Corvus "engaged in unfair competition by misappropriating [FFC's] confidential and proprietary information, including pricing information, which constituted trade secrets of Plaintiff FFC." Compl. ¶ 105. The Proposed Amended Complaint adds that the alleged misappropriation contravened the District of Columbia Uniform Trade Secrets Act, D.C. Code. § 36-401 *et seq.* Proposed Am. Compl. ¶ 105.

Count IV of the Proposed Amended Complaint also adds a claim that "[b]y agreeing to protect FFC's Trade Secrets both during the term of the Teaming Agreement and thereafter, Corvus undertook a fiduciary duty to FFC," and that "[b]y its unauthorized use and disclosure of FFC's Trade Secrets . . . Corvus breached the trust and confidence that FFC had placed in it." Proposed Am. Compl. ¶¶ 111–12.

Under Illinois law, a "plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract."[17] *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (1986); *see also Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 615 (7th Cir. 2001) (explaining that the economic loss doctrine "denies a remedy in tort to a party whose complaint is rooted in disappointed contractual or commercial expectations."), quoting

---

17     The Court notes that the economic loss doctrine would bar FFC's tort claims under D.C. law as well. *See Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008) ("[T]he tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship.").

*Collins v. Reynard*, 607 N.E.2d 1185, 1188 (Ill. 1993) (Miller, J., concurring). The doctrine "acts as a shorthand means of determining whether a plaintiff is suing for injuries arising from the breach of a contractual duty . . . or whether the plaintiff seeks to recover for injuries resulting from the breach of the duty arising independently of the contract." *2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 352 (Ill. 1990), quoting *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 948 (11th Cir. 1982). Courts in Illinois have applied the economic loss doctrine to cases involving the breach of a non-disclosure provision, *U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1107–08 (N.D. Ill. 2012), as well as to breach of fiduciary duty claims. *Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 449 N.E.2d 125, 126, 128 (Ill. 1983).

In its opposition to defendant's motion to dismiss, plaintiff argued that it had stated a misappropriation claim, but other than asserting without more that "the tort causes of action . . . do not arise out of the Agreement," Pl.'s Opp. at 13, and that "Illinois has an exception to the economic loss doctrine for fraud," *id.* at 21, FFC did not offer any legal grounds for why the Court should conclude that the economic loss doctrine does not apply to plaintiff's tort claims that are not based on fraud. *See* Pl.'s PAC Reply at 4 (restating its argument that the economic loss doctrine does not apply to the fraudulent misrepresentation claim). By failing to oppose that part of Corvus' motion to dismiss, FFC has conceded that its breach of fiduciary duty and misappropriation claims are barred by the economic loss doctrine. *See, e.g.*, *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004); *see also Tax Analysts v. IRS*, 117 F.3d 607, 610

(D.C. Cir. 1997) (treating argument raised by the defendant as conceded where the plaintiff failed to oppose it).   And the Court finds that even if the issue has not been conceded, the doctrine squarely applies in this case.[18]

Since the amendment of the misappropriation claim as proposed in Count IV of the Proposed Amended Complaint and proposed addition of the breach of fiduciary duty claim would be futile, leave to amend will be denied, and plaintiff's misappropriation claim in Count IV of the original complaint will be dismissed for failure to state a claim.   .

**IV.   FFC's fraudulent inducement claim fails because it arises out of a promise contained in the contract, and is therefore barred by the economic loss doctrine.**

Count III of the original complaint alleged that Corvus fraudulently induced FFC to contract when Corvus promised to:  (1) keep FFC's trade secrets confidential, Compl. ¶ 91(a); (2) offer FFC a subcontract "for the [SBA] program[s]," Compl. ¶ 91(b) (alterations in original)[19]; and (3) enter into a subcontract with FFC for "Quality Assurance, Training, and other related services."  Compl. ¶ 91(c).  Count II of the Proposed Amended Complaint omits the second and

---

18      Plaintiff's assertion that its tort claims are independent of the contract, Pl.'s Opp. at 13, is unpersuasive given plaintiff's own allegations that FFC's disclosures of confidential information were made "[a]fter FFC executed the Teaming Agreement," pursuant to "FFC's clear understanding that its being forthcoming in providing its Trade Secrets to Corvus . . . was protected by . . . Article 4, as well as by Article 12, of the Teaming Agreement." Proposed Am. Compl. ¶ 41, 43.  Indeed, the misappropriation claim in Count IV is expressly predicated on the contract: "FFC's Trade Secrets were acquired by Corvus as a result of its confidential relationship with FFC arising out of Article 4 and Article 12." Proposed Am. Compl. ¶ 99; *see also* Proposed Am. Compl. ¶ 103 ("FFC's reliance upon the confidentiality provisions of Articles 4 and 12 shows that FFC utilized reasonable efforts to maintain the confidentiality of its Trade Secrets, only revealing them to Corvus because of the trust that FFC had in Corvus to comply with its representations that it would protect those Trade Secrets.").

19      The alterations in plaintiff's quotation from the Teaming Agreement in the original complaint were misleading.  The contract did not provide that FFC would offer a subcontract "for the [SBA] program[s]."  Compl. ¶ 91(b).  It called for the negotiation of a subcontract "[i]f Prime [Corvus] is selected by Client as the prime contractor *for the Program . . .*" (emphasis added).  TA ¶ 2, and the Agreement clearly defined the "Program" as only "SBA 7A Risk Oversight Support Services."  TA Recital ¶ A.

third alleged promises, and focuses on the allegation that Corvus fraudulently induced FFC to contract by promising to keep FFC's trade secrets confidential.

Specifically, paragraph 86 of the Proposed Amended Complaint alleges:

> In inducing FFC to enter into the Teaming Agreement, Corvus represented to FFC that it would, "keep in confidence and prevent the disclosure to . . . any person(s) within their organizations not having a need to know, all information received from the other . . . which, given its character and nature, a reasonable person under like circumstances would treat as proprietary, and to use such information only in connection with their obligations under this Agreement."

Proposed Am. Compl. ¶ 86.

The complaint asserts that "Corvus did not do, and did not intend to do the things that it represented . . . if it were awarded a contract for [RFP-16]." Compl. ¶ 93. The Proposed Amended Complaint indicates that Corvus promised to keep FFC's trade secrets confidential "both at the time of the execution of the Teaming Agreement and after its expiration," and that "[a]t the time that Corvus made the foregoing representations, Corvus did not not [sic] intend to do the things that it represented it would do, then or in the future." Proposed Am. Compl. ¶¶ 87–88.   In other words, FFC's fraud in the inducement claim is indistinguishable from the breach of contract claim except that plaintiff has added a conclusory allegation that Corvus had its fingers crossed when it executed the contract.  But that is not sufficient to avert the dismissal of the claim.

To state a claim of fraud in the inducement, plaintiff must plausibly allege:  "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance."  *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003), quoting *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1341 (7th Cir. 1992).

But what plaintiff is quoting is not a statement allegedly made by the defendant to induce plaintiff to enter the contract. It is the promise made in the contract itself. *See* TA ¶ 4. For that reason alone, the claim fails as a matter of law. "Courts generally agree that fraud in the inducement, necessarily prior to the contract, is independent of the contract and therefore not barred by the economic loss doctrine." *Marvin Lumber & Cedar Co. v. PPG Indus.*, 223 F.3d 873, 885 (8th Cir. 2000). But here, the alleged misrepresentation was not made – as is necessary – prior to the contract; it was a promise made in the contract itself. As the Seventh Circuit has recognized: "Where there are well-developed contractual remedies, . . . there is no need to provide tort remedies for misrepresentation. The tort remedies would duplicate the contract remedies, adding unnecessary complexity to the law. Worse, the provision of these duplicative tort remedies would undermine contract law." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 865 (7th Cir. 1999).[20] FFC's fraudulent misrepresentation claim – which is based on the contract itself – would duplicate its remedies for breach of contract and is therefore barred by the economic loss doctrine.

Similarly, under D.C. law:

> [C]onduct occurring during the course of a contract dispute may be the subject of a fraudulent or negligent misrepresentation claim when there are facts separable from the terms of the contract upon which the tort may independently rest and when there is a duty independent of that arising out of the contract itself, so that an action for breach of contract would reach none of the damages suffered by the tort.

---

[20]   Plaintiff is correct that under both Illinois and D.C. law, there is an exception to the economic loss doctrine for claims of fraudulent inducement. *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 452 (Ill. 1982); *Intelsat USA Sales Corp.*, 935 F. Supp. 2d 101, 113–14 (D.D.C. 2013). But those cases do not apply to situations like this one, where the alleged misrepresentation was made within the contract itself.

*Choharis*, 961 A.2d at 1089.  FFC does not allege that Corvus made any misrepresentations other than the promises embodied in the contract, so even if the Court were to consider plaintiff's claims under D.C. law, it would fail for the same reasons.

For those reasons, plaintiff's motion for leave to amend the original Count III with Count II of the Proposed Amended Complaint will be denied as futile, and Count III of the original complaint will be dismissed for failure to state a claim.

**V.     FFC's claim for injunctive relief fails.**

The original complaint also alleged in Count V that Corvus intended to violate the Agreement's non-solicitation provision, which provides that "[d]uring the term of this Agreement and for a period of one (1) year following its expiration or termination, neither party will actively solicit, employ or otherwise engage any of the other party's employees (including former employees) who were involved in the proposal."  *See* TA ¶ 11; Compl. ¶¶ 108–12.  FFC alleged: "[u]pon information and belief, defendant Corvus intends to hire Mr. Babb[21] as a subcontractor for its contract" on RFP-16.  Compl. ¶ 111.  FFC alleged that "Mr. Babb has been the Project Manager for [p]laintiff in the performance of various contracts with the SBA . . . ."  Compl. ¶ 108.

Defendant moved to dismiss the claim on several grounds, pointing out that the complaint did not specifically allege that Babb was an FFC employee, and the exhibits attached to the complaint revealed that he worked at an outside firm: Babb Maldonado & Associates LLC. Def.'s Mot. at 11, citing Exs. 3, 8 to Compl. [Dkt. # 1-3, 1-8].  In response, plaintiff's Proposed Amended

---

21     The original complaint referred to Babb as "Mr. Fredy Babb" or "Mr. Babb."  Compl. ¶¶ 8, 25, 108–112; *see also id.* at 20 (Prayer for Relief) (referring to him as "Mr. Freddie Babb").  The Proposed Amended Complaint, and the exhibits to both the complaint and the proposed amended complaint clarify that Babb's full name is "Frederick Babb."  Proposed Am. Compl. ¶ 8; Exs. 3, 8 to Compl. (emails from Babb signed by "Frederick D. Babb"); Exs. 3, 8 to Proposed Am. Compl. [Dkt. # 17-4, 17-9] (reattaching those emails).

Complaint adds the allegation that Babb "was *employed* as the Project Manager" for FFC. Proposed Am. Compl. ¶¶ 8, 116 (emphasis added).

The complaint sought an injunction prohibiting Corvus from "soliciting, employing or otherwise engaging Mr. [] Babb for work of any kind, directly or indirectly, in connection with" RFP-16.   Compl. at 20 (Prayer for Relief).   The Proposed Amended Complaint adds that the injunction should prohibit Babb from working on RFP-16 "and any other SBA programs." Proposed Am. Compl. at 20 (Prayer for Relief).

But the Proposed Amended Complaint does not state a claim that would entitle plaintiff to preliminary or permanent injunctive relief because FFC no longer has any contractual right to prohibit Corvus from employing Babb, whether he was ever an employee or not.   FFC alleges that on September 22, 2014, another contractor was awarded the contract for RFP-3, Compl. ¶ 56; Proposed Am. Compl. ¶ 56, and the Agreement terminated on that day.   TA ¶ 3.B.   The non-solicitation provision applied "for a period of one (1) year following [the Agreement's] expiration or termination," *id.* ¶ 11, and so the non-solicitation provision expired on September 22, 2015.[22] Corvus would therefore not be in breach of its Teaming Agreement with FFC if it hired Babb at any point after September 23, 2015.

In other words, there is no "valid and enforceable contract" that can be breached, *see Han*, 762 F.3d at 600, so there is no impending breach to be enjoined.

---

[22]     The Court notes that plaintiff's Motion for Leave to File an Amended Complaint was filed on September 23, 2015 – the day after the non-solicitation provision expired.

## CONCLUSION

For the foregoing reasons, the Court will deny plaintiff's motion for leave to amend its complaint as futile, and grant defendant's motion to dismiss for failure to state a claim upon which relief can be granted.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 30, 2016